No. 118,738

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRIDGETTE MARIE WARNKE,
*Appellant*.

SYLLABUS BY THE COURT

1.

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in the light favoring the State, the appellate court is convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. In doing so, the reviewing court does not reweigh evidence, resolve evidentiary conflicts, or make determinations of witness credibility.

2.

A conviction of reckless aggravated battery under K.S.A. 2018 Supp. 21-5413(b)(2) requires the State prove the defendant acted recklessly. Under K.S.A. 2018 Supp. 21-5202(j), a defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk, and the defendant's act of disregarding the risk must be a *gross deviation* from the standard of care a reasonable person would use under the same circumstances.

3.

It takes proof of more egregious conduct to convict a defendant of reckless aggravated battery than necessary to convict a defendant of vehicular homicide. Our vehicular homicide statute, K.S.A. 2018 Supp. 21-5406, unlike our reckless aggravated

1

battery statute, K.S.A. 2018 Supp. 21-5413(b)(2), does not require proof of reckless misconduct. Conduct characterized as something between ordinary negligence and gross negligence will suffice for a vehicular homicide conviction. Further, vehicular homicide is predicated on conduct which constitutes a *material deviation* from the standard of care, which a reasonable person would observe under the same circumstances, while reckless aggravated battery is predicated on conduct which is a *gross deviation* from the standard of care.

4.

Speaking on a cell phone while driving is not a violation of our traffic laws. Distracted driving caused by speaking on a cell phone may constitute negligence but in and of itself it does not constitute a *gross deviation* from the standard of care so as to support a criminal conviction for reckless aggravated battery. Nor does such conduct, without more egregious conduct or dangerous circumstances, exhibit a motorist's conscious disregard of a substantial risk that the motorist will collide with some vehicle ahead so as to support a criminal conviction.

5.

Conduct necessary to support a conviction of criminal damage to property under K.S.A. 2018 Supp. 21-5813(a)(1), (c)(3), a class B misdemeanor, includes "[k]nowingly damaging, destroying, . . . or substantially impairing the use" of another's property without consent.

6.

Under K.S.A. 2018 Supp. 21-5202(b), the culpable mental states are listed from the highest to the lowest relative degree as follows: (1) intentionally, (2) knowingly, and (3) recklessly. Proof that a person acted knowingly also is proof that a person acted recklessly, a lower degree of culpability. But it does not work in the other direction. Proof

of reckless conduct does not also constitute proof that a person acted knowingly. K.S.A. 2018 Supp. 21-5202(c).

7.

To support a finding that a person acted knowingly, K.S.A. 2018 Supp. 21-5202(i) requires, among other things, a showing that the person is aware that his or her conduct is *reasonably certain* to cause the result that followed.

Appeal from Dickinson District Court; BENJAMIN J. SEXTON, judge. Opinion filed May 3, 2019. Reversed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Daryl E. Hawkins*, assistant county attorney, *Andrea Purvis*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., PIERRON, J., and MCANANY, S.J.

MCANANY, S.J.: On a summer day on a straight and level highway in Dickinson County, the 21st century collided with the 19th century with near-tragic consequences. An automobile driven by Bridgette Warnke collided with a horse-drawn open two-wheeled buggy—sometimes referred to as a forecart—with an empty hay trailer attached. The buggy was occupied by Malachi and Micah Hamilton, ages 13 and 15, who are members of the Amish Mennonite community. The collision resulted in the boys being thrown from the buggy and injured and one of the horses being killed.

While it is apparent that the collision was caused by Warnke's negligence, we conclude that her conduct was not criminal in nature. Accordingly, we reverse Warnke's criminal convictions for two counts of felony reckless aggravated battery and for misdemeanor criminal damage to property that arose from this unfortunate incident. We

dismiss as moot Warnke's constitutional claim with respect to K.S.A. 2018 Supp. 21-5413(b)(2).

The accident resulted in Warnke being charged with two counts of felony reckless aggravated battery, misdemeanor criminal damage to property, and two traffic infractions: following another vehicle too closely and using an electronic device while operating a motor vehicle. The traffic infraction charges were tried to the court. The three remaining charges were tried to a jury. Warnke was convicted on all charges. The district court sentenced her to 16 months in prison on the felony reckless aggravated battery convictions and a consecutive 6-month jail sentence on her misdemeanor criminal damage to property conviction, but granted her probation. As a condition of probation, the district court ordered Warnke to serve 15 consecutive weekends in jail.

FACTS

The testimony and documentary evidence educed at trial establish the following.

Micah and Malachi Hamilton had used a borrowed trailer to haul hay to their family farm. At the time of the accident they were on their way from home to return the hay trailer. They rode on a two-wheeled buggy with a team of two horses. The empty hay trailer was attached to the buggy. There was a 14-inch slow-moving vehicle emblem attached to the back of the trailer. Their route took them on Highway K-43 north of Enterprise.

Both boys testified that as they traveled north on K-43 their buggy and trailer never left the asphalt roadway and did not cross over the white fog line. Micah explained that they stay on the highway not only for safety, but also because the horses preferred it—the hard asphalt provided better footing for the horses and made pulling the buggy and trailer easier.

4

While Malachi was driving the team, Micah heard something behind them and turned to see a quickly approaching car. Micah did not see the car slow down, and there was no oncoming southbound traffic on K-43. He did not have a chance to warn Malachi about the approaching car before it struck the hay trailer, throwing both boys into the ditch beside the road. Micah remembered hitting his head but then lost consciousness until he later found himself in the ditch. Meanwhile, Malachi had broken his leg in the collision. One of the horses was dead, and the other had run off.

Vance Riffel witnessed the accident. He was driving his pickup truck home from work and traveling north on Highway 43 at the speed limit of 55 miles per hour. He was following Warnke's vehicle, which he estimated was about an eighth of a mile ahead of him. He also saw a horse-drawn carriage in front of Warnke, which was traveling in the same lane of traffic and was not off the road or on the shoulder. Riffel did not see any oncoming southbound traffic. Warnke's vehicle and "the horse drawn carriage in front of her" were the only traffic he observed on the road that day. When Warnke collided with the trailer, Riffel saw a dark object fly off to the left. He later determined this was one of the horses that had been pulling the buggy and trailer. He saw "another couple objects fly off to the right." Those were the two boys.

According to Warnke, on the day of the accident, a Friday, she had been working at the elementary school in Enterprise. She had left her daughter with Christina Bartlett that morning because Warnke's daughter did not have Head Start preschool on Fridays. Warnke parked that day at the Methodist church parking lot across the street from the school.

At the end of the work day, she checked her cell phone and saw a text from Christina who asked Warnke when she was going to pick up her child. While sitting in

her car in the church parking lot, Warnke texted to Christina: "Leaving Enterprise now." Warnke then pulled out of the church parking lot and headed for home.

When Warnke reached the stop sign, "which is right before you turn onto 43," she received another text message from Christina asking whether Warnke was bringing Christina's child home with her. Warnke called Christina and told her that her daughter had taken the bus home. That call lasted for 46 seconds. Warnke claimed she made this call while she was stopped at the stop sign and before turning onto K-43.

Warnke's call to Christina was at 3:31 p.m. Christina attempted to call Warnke back at 3:39 p.m. Warnke did not pick up that call because the accident had happened— sometime between 3:31 and 3:39 p.m.

As Warnke turned onto Highway K-43 the speed limit was 30 miles per hour. Once she crossed a bridge the speed limit increased to 55 miles per hour. As she proceeded north on K-43 Warnke's speed was "55, maybe 57." She testified: "I seen the trailer and I went to go around it. There was a truck coming in the other lane, so I pulled back over, I hit my brakes. I realized the horse was coming back on the road, because they were off to the shoulder, and the impact happened."

Witness Riffel pulled up to the accident scene. He testified to the following at trial:

> "[Prosecutor:] Okay. Did you park before you called 911?
> "[Riffel:] Um, it was kind of a simultaneous deal. I just remember stopping and calling right away."
> "[Prosecutor:] Okay, Um, when you called, were you still in your car?
> "[Riffel:] Yes."

6

When pressed further, Riffel testified it was possible that he called 911 approximately two minutes after he stopped at the scene, maybe a minute longer or a minute shorter. But on cross-examination he stated that he did not delay in calling 911: "As soon as I got to the scene I called."

When Warnke first talked to Riffel he was on the phone. Warnke told Riffel she thought she was okay but was worried about the boys. Warnke then

"proceeded to go back to my car to get my phone, because I wasn't sure if he was on the phone with 911, or just on the phone. And there was another car that pulled up and she came up to see if I was all right, and I told her I needed to find my phone. I need to get ahold of my mom, because he's on the phone with 911. And she found my phone in my passenger floorboard, under the dash, inside my purse still, and she called my mom and told my mom what had happened."

When Riffel spoke to Warnke about how the accident happened, she told him "the trailer was down in the ditch and it was coming up on the road and she couldn't stop." According to Riffel, that is not what he saw.

Trooper Cole McGee from the Kansas Highway Patrol responded to Riffel's 911 call. The 911 call came in at 3:34 p.m. When McGee arrived at the scene, he found the triangular slow-moving vehicle emblem on the ground under the hay trailer. Warnke's vehicle had "struck the rear of that hay trailer, directly in the center of it."

McGee spoke with Riffel who told him that the boys' buggy was directly in its lane of travel. The boys also stated that they were directly in their lane. Riffel told McGee that he saw brake lights on Warnke's vehicle only at the time of the impact.

McGee also spoke to Warnke. McGee had no indication that Warnke was impaired in any way by drugs or alcohol. No alcohol was found in her car. This was

7

Warnke's first automobile accident. Warnke told McGee that she was driving north from Enterprise on K-43 when she saw the horse and trailer coming out of the ditch and onto the highway in front of her. But in her written statement Warnke said that when she saw the buggy and trailer "[t]hey were off the road a little." She told McGee that she slowed down to pass them but when she saw an oncoming vehicle traveling south she had to get back in her lane and could not stop in time. According to the police report, Warnke stated that she was going 55 miles per hour at the time of the impact.

Trooper McGee testified that Warnke's story did not match his investigation. McGee observed only 13 feet of brake marks leading up to the point of impact, indicating that if Warnke was traveling 55 miles per hour, she applied her brakes approximately .16 seconds before the collision. Further, McGee found no evidence that the buggy and trailer had been pulled through the ditch. The ditch had very tall and unmaintained grass that was undisturbed. The ditch was very steep, and it would have been difficult for a horse and buggy to get through it.

McGee checked the text messages and phone call record on Warnke's cell phone and found a text message sent at 3:29 p.m. which stated "Leaving Enterprise now." The phone showed an incoming text message from Christina Bartlett, the babysitter, at 3:31 p.m. That message was, "Do you have my kid?" Warnke's phone log showed an outgoing phone call at 3:31 p.m. that lasted for 46 seconds.

A few days before trial, McGee conducted a test to determine how long it took to drive from the northwest corner of the school parking lot to the accident scene. He did not start from the parking stall at the United Methodist Church, but the church is "directly west" of and "very close" to the school.

McGee made three separate trips from the school parking lot to the accident scene. The average time was two minutes and six seconds. So, according to McGee, if Warnke

8

sent her first text message while at the school at 3:29 p.m., the second text message at 3:31 p.m. "[w]ould have been right around the time of the crash."

McGee apparently made no calculation of the time and distance from the stop sign where Warnke stopped before entering K-43 to the point of impact.

At the close of the State's case the court denied Warnke's motion for a judgment of acquittal. Then, at the close of all the evidence, Warnke renewed her motion for a judgment of acquittal. The court asked, "Has anyone thought to look for the witness that got the purse out of the defendant's car when she said the purse was underneath the dash and the cell phone was in the purse? That's uncontroverted at this point, folks. Not refuted." The court then declared a recess and did not explicitly rule on Warnke's motion, but it appears that the motion was denied.

The court instructed the jury on the various iterations of battery and included in Instructions No. 3, 5, 6, 7, and 9 the following:

"A defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that a result of the defendant's actions will follow.
"This act by the defendant disregarding the risk must be a gross deviation from the standard of care a reasonable person would use in the same situation."

In instructing the jury on the charge of criminal damage to property, the court instructed that the defendant must have acted knowingly in damaging the subject property. Instruction No. 10 stated: "A defendant acts knowingly when the defendant is aware that her conduct was reasonably certain to cause the result complained about by the State."

9

After the court instructed the jury, the parties presented their final arguments with regard to the two charges of felony reckless aggravated battery and the charge of misdemeanor criminal damage to property.

The State argued that Warnke engaged in reckless behavior. The horse-drawn buggy and trailer never left the roadway, and there was no oncoming vehicle as Warnke claimed. Warnke did not slow down as she approached the boys, and she did not apply her brakes until a fraction of a second before impact. Moreover, the State argued that based on the various phone calls and text messages, the accident occurred "at 3:32 or approximately 3:32. This would have been after the call ended, but when she was still— she still would have been distracted by the phone." The State did not address the misdemeanor criminal damage to property charge.

Warnke's argument focused on her version of how the accident occurred and the State's requirement to prove recklessness. "Did Bridgette Warnke act recklessly when she had this accident? . . . Recklessly is a gross, extreme deviation from the standard of care a reasonable person would use in the same situation." Warnke's counsel only addressed the misdemeanor criminal damage to property charge in passing.

After the jury withdrew, the court heard the separate closing arguments of the parties on the two charged traffic infractions which were being tried to the court rather than to the jury. The court found Warnke guilty of following another vehicle too closely based on the obvious fact that she collided with the rear of the boys' vehicle.

With regard to the charge of using an electronic device while operating a motor vehicle, the court observed: "If this were alleged at the time of the incident, I would find you not guilty, because there is no evidence, in this Court's opinion, as to the time of this incident." But the court found Warnke guilty based on the fact that she was reading

10

Christina's text message while stopped in her car with the engine running at the stop sign before turning onto K-43.

It is apparent that the jury was persuaded by the State's closing argument and rejected Warnke's explanation that she had seen the slow-moving buggy and trailer, tried to pass it, but had to return to her lane because of an oncoming truck. The jury found Warnke guilty on the two charges of felony reckless aggravated battery and the charge of misdemeanor criminal damage to property.

Before sentencing Warnke again moved for a judgment of acquittal and moved for a new trial based upon the insufficiency of the evidence. The court denied Warnke's motions, stating:

> "[T]his Court had some issue with in regards to whether or not the State proved that you were on that cell phone at the time. However, the officer's testimony and the witness testimony, there was no slowing down of that vehicle. The vehicle was driven directly into a—a horse and buggy that was not off in the ditch. The evidence indicates it was on the roadway and you hit it in the back without braking. There was substantial damage done. The charge is a reckless charge. This Court finds that the jury had sufficient evidence to make that finding under that statute, under that reckless, causing harm to another. Driving a motor vehicle at that speed without—without due caution. So the Court's going to deny both the motion for [judgment] of acquittal and the motion for a new trial."

Warnke's appeal brings the matter to us.

Warnke argues that her actions amounted only to inattentive driving, which cannot constitute a gross deviation from the standard of care which a person would observe under the same circumstances in order to convict her of reckless aggravated battery.

She contends further that there is no evidence that she acted knowingly—with an awareness that her conduct was reasonably certain to cause the collision—to support her criminal damage of property conviction.

*Standard of Review*

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light favoring the State, we are convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. In doing so, we do not reweigh evidence, resolve evidentiary conflicts, or make determinations of witness credibility. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

*Analysis*

Warnke argues that in the light favoring the State, "the record only contains at most evidence of inattentive driving, which cannot support findings of reckless or knowing acts."

Warnke was convicted of felony reckless aggravated battery under K.S.A. 2016 Supp. 21-5413(b)(2)(A) (for the injuries to Malachi) and K.S.A. 2016 Supp. 21-5413(b)(2)(B) (for the injuries to Micah). Each of these statutory provisions requires the State prove Warnke acted recklessly. The court instructed the jury that a defendant acts

12

recklessly when he or she consciously disregards a substantial and unjustifiable risk, and the defendant's act disregarding the risk must be a gross deviation from the standard of care a reasonable person would use in the same situation.

Warnke was also convicted of misdemeanor criminal damage of property which requires proof that Warnke acted knowingly.

*The Facts Supported by the Evidence*

Our first task is to determine which factual assertions are supported by the record and which are not. Then we will consider the legal consequences of those acts which are supported by the record.

Under the unique facts of this case, we must determine not only whether the evidence supports the State's contentions about how the accident happened, but also when the accident happened. We first look at the evidence as to how the accident happened.

Viewing the evidence in the light favoring the State, the evidence supports the State's contention, reflected in the jury's verdict, that Warnke did not attempt to pass the boys' slow-moving buggy and trailer and then, at the last moment, pull back into the northbound lane to avoid a head-on collision with an oncoming southbound vehicle, thereby causing her to collide with the boys' vehicle. The boys saw no approaching southbound vehicle. Neither did witness Riffel. The jury apparently believed the State's evidence on this point and not Warnke's.

Further, there is substantial evidence to support the State's contention that Warnke did not initially think it was safe to pass because the boys' vehicle was either off the road in the ditch or on the shoulder of the road. The boys testified that they were always within the northbound lane of travel and never crossed the fog line. This is confirmed by what

13

Riffel saw. Moreover, investigating Trooper McGee found no evidence that the buggy and trailer had been pulled through the tall grass in the steeply sloped ditch.

Warnke stated that she was traveling 55 to 57 miles per hour as she headed north on Highway K-43. According to the police report, she said she was traveling the speed limit—55 miles per hour—at the time of impact. McGee computed from the tire marks leading to the point of impact that at Warnke's speed she applied her brakes only .16 seconds before impact. The impact was not a glancing blow as she attempted to return to the northbound lane. She struck the empty trailer full-on in the rear center of the trailer.

It is uncontested that the weather that day was cloudy or overcast and that there was no rain. The road was flat and straight with no visual obstructions. The collision obviously was not an intentional attack on the boys. So what caused the collision? The testimony presents two alternatives: Warnke being distracted by her cell phone or by simple inattention.

We know that Warnke used her cell phone as she drove between the school and the accident scene. So when was Warnke using her phone in relation to the accident?

The district court was not the fact-finder with respect to the felony charges against Warnke. Nevertheless, in deciding the traffic infraction of texting while driving in violation of K.S.A. 2016 Supp. 8-15,111, the judge commented: "I don't see the evidence to show beyond a reasonable doubt, that you were texting at the time of this collision." The judge based this on the fact that the State failed to establish exactly when the accident occurred. Nevertheless, Warnke was convicted of texting while driving based on her texting to Christina while stopped at the stop sign before entering Highway K-43 and well before the collision.

14

Viewing the evidence in the light favoring the State, the evidence does not establish that Warnke was using her phone to text at the time of the collision. The uncontested evidence establishes that the only text message Warnke sent during the relevant time period was as she left the school—a considerable distance from the accident scene. After that, she received a text message from Christina and then placed a 46-second phone call to Christina. If the accident happened while Warnke was reading Christina's second text message, that 46-second phone call would never have occurred. So the phone call to Christina had to have occurred after Christina's text message and before the accident.

We have the benefit of exact times for certain events in this case. The last text was from Christina at 3:31, followed by a 46-second phone call from Warnke at 3:31 which would have ended at about 3:32.

The 911 call came it at 3:34:27. Riffel placed this 911 call after arriving at the accident scene. He had been traveling behind Warnke at a speed of 55 miles per hour and at a distance he estimated to be about an eighth of a mile when the accident occurred. Using Trooper McGee's speed/distance/time computations, the accident occurred about eight seconds or so before Riffel arrived at the scene.

If Riffel placed the 911 call a few seconds after arriving at the accident scene, his final testimony on that point, that places the time of impact at somewhere around 3:34 p.m. But if Riffel waited a couple of minutes after arriving at the scene before calling 911—the evidence viewed in the light favoring the State—that would place the time of impact around 3:32, about the time Warnke ended her call to Christina.

Christina testified at trial. There was no evidence educed from her testimony that Warnke's 46-second call to her was cut off or ended abruptly, which would be the case if they were engaged in conversation at the time of impact. Thus, viewing the evidence in

15

the light favoring the State, there is substantial evidence that Warnke had just completed her call to Christina when the accident occurred.

This conclusion required the jurors to disregard Warnke's testimony that she received Christina's last text message while she was stopped at the stop sign before entering Highway K-43 and that she placed her 46-second call to Christina before turning onto Highway K-43. Given Warnke's unsupported and independently contradicted testimony about the boys being off the road and the oncoming vehicle, this is apparently what the jurors did. In this regard, the jurors were the sole arbiters of the facts regarding the reckless aggravated battery and the criminal damage charges. They were not bound by the district court's finding on the texting-while-driving charge—which, by the way, was never communicated to them—that Warnke read Christina's text while she was "sitting at the stop sign, in the city of Enterprise, getting ready to turn onto K-43."

As between the two—using a cell phone while driving and sending or reading a text message—texting obviously is more of a distraction to a motorist than placing or receiving a cell phone call. Creating or reading a text requires attention to the mobile device itself and not to the road ahead. Thus, it is unlawful under K.S.A. 2018 Supp. 8-15,111 for a motorist to send or read a text while driving. But it is not unlawful in this state to use a cell phone to make a phone call while operating a motor vehicle.

Immediately after the accident Warnke's phone was found in her purse on the passenger floorboard of her car, where it very well could have fallen from the passenger seat during the rapid deceleration in the collision. As the district court noted, this evidence is uncontested.

The phone could have been found in Warnke's purse on the floor as a result of one of two scenarios. First, Warnke could have completed her 46-second phone call to Christina, returned the phone to her purse, and placed her purse on the seat before the

16

impact. As an alternative, Warnke could have been using the Bluetooth capabilities of her Nissan Versa automobile to make the call through her car's audio system while the actual phone remained in her purse. But the State presented evidence on neither of these alternatives. So the jury was simply left with evidence regarding the close proximity of ending the phone call and the subsequent impact.

*The Legal Consequences Arising from the Facts Supported by the Evidence*

*Reckless Aggravated Battery*

This brings us to consider the legal consequences of these facts. Warnke was convicted of reckless aggravated battery under K.S.A. 2016 Supp. 21-5413(b)(2)(A) and K.S.A. 2016 Supp. 21-5413(b)(2)(B), each of which requires the State prove Warnke acted recklessly.

K.S.A. 2018 Supp. 21-5202(j) states:

> "A person acts 'recklessly' or is 'reckless,' when such person *consciously* disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a *gross deviation* from the standard of care which a reasonable person would exercise in the situation." (Emphases added.)

It is interesting to note that our vehicular homicide statute, K.S.A. 2018 Supp. 21-5406, does not require proof of reckless or intentional misconduct. Conduct characterized as something between ordinary negligence and gross negligence will suffice for a conviction. Vehicular homicide is predicated on operating a vehicle "in a manner which creates an unreasonable risk of injury to the person or property of another and which constitutes a *material deviation* from the standard of care which a reasonable person would observe under the same circumstances." (Emphasis added.) K.S.A. 2018 Supp. 21-

17

5406(a). The vehicular homicide statute defines a "material deviation" as "conduct amounting to more than simple or ordinary negligence but not amount[ing] to gross negligence." K.S.A. 2018 Supp. 21-5406(c). A culpable material deviation is something less than recklessness. *State v. Randol*, 226 Kan. 347, 354, 597 P.2d 672 (1979).

This contrasts with our reckless aggravated battery statute which requires a showing of reckless conduct—the *conscious* disregard of a substantial and unjustifiable risk—which amounts to a *gross deviation* from the standard of care. Thus, it takes more egregious conduct to convict Warnke under our aggravated battery statute for conduct that results merely in bodily harm than it does to convict a defendant of vehicular homicide.

What constitutes a gross deviation from the standard of care for a motorist driving down a clear, dry, straight, level, relatively traffic-free, two-lane highway during daylight hours? We know what the negligence standard is under these circumstances. We expect a driver on a public highway to "keep a proper lookout for other vehicles and objects in (*his*) (*her*) line of vision that may affect (*his*) (*her*) use of the highway." PIK Civ. 4th 121.03. To convict Warnke of a gross deviation from this standard, the State had to prove substantially more. It had to prove that Warnke's conduct exhibited a conscious disregard of a substantial and unjustifiable risk that by talking on her cell phone she would collide with a slow-moving vehicle ahead.

Our reported cases on this subject is rather sparse. They deal with our negligent homicide statute, which requires less egregious conduct for a conviction than in Warnke's case. Here are three of the more recent cases.

*State v. Trcka*, 20 Kan. App. 2d 84, 884 P.2d 434 (1994), is a vehicular homicide case. In *Trcka*, the defendant, a professional driver operating a semitrailer truck, drove past several signs warning of a construction zone. He proceeded at a speed of 50 to 55

18

miles per hour in a 45-miles-per-hour construction zone and collided with the rear of a highway worker's pickup truck. The pickup truck had a flashing light and its hazard lights on and a man at the rear of the pickup "frantically motioning to the truck to go around." 20 Kan. App. 2d at 85. The court upheld the defendant's vehicular homicide conviction, stating: "[F]or a professional driver to be oblivious to his surroundings while propelling a semitrailer truck down a highway at 50 to 55 miles per hour is closer to reckless and wanton conduct than to simple negligence." 20 Kan. App. 2d at 88.

State v. Krovvidi, 274 Kan. 1059, 58 P.3d 687 (2002), is another vehicular homicide case that required less egregious conduct than was required to support Warnke's conviction. In Krovvidi, the defendant driver ran a red light, killing a passenger in another vehicle. Following a court trial, the court found the defendant guilty of vehicular homicide based on running the red light alone, without any indication of recklessness or impairment.

On appeal, our Supreme Court gave examples of conduct which could constitute a material deviation from the ordinary negligence standard of care: drinking, drug use, ignored warnings from a passenger, reckless driving, accelerating while approaching an intersection, and speeding. 274 Kan. at 1075. The court reversed the defendant's vehicular homicide conviction, holding that insufficient evidence supported his conviction because his action of running the red light, without any aggravating circumstances, was not a material deviation from the standard of care as required by K.S.A. 21-3405. 274 Kan. at 1075.

More recently, a panel of our court decided State v. Butts, No. 117,883, 2018 WL 2748511 (Kan. App. 2018) (unpublished opinion). Butts is another vehicular homicide case. There, the defendant was driving a commercial poultry semitrailer truck on U.S. Highway 24. He was following another poultry semitrailer truck and "'he was trying to stay on the vehicle.'" 2018 WL 2748511, at *2. He approached an intersection controlled

19

by four overhead traffic signals regulating through-traffic on Highway 24. He was familiar with the intersection and previously had to come to an abrupt stop at the intersection.

Before reaching the intersection the defendant proceeded at a speed of at least 55 miles per hour, the speed limit. He passed two warning signs of the signals ahead—one sign a half mile from the intersection, the other .3 miles before the intersection—each warning drivers, "'BE PREPARED TO STOP.'" 2018 WL 2748511, at *1. He failed to slow down or stop at the red light and struck the driver's side of the victim's crossing vehicle.

The investigation that followed disclosed that the defendant only applied his brakes once he was in the intersection. The defendant's truck needed almost the length of a football field to stop at a speed of 55 miles per hour. Moreover, three of the brakes on the defendant's trailer were out of adjustment. A witness following behind the defendant's truck saw the truck speed up before reaching the intersection. She saw that the defendant was following another semitrailer truck and she thought the defendant was trying to keep up with that other truck. She did not see any brake lights on the defendant's trailer until after the collision.

The court in *Butts* affirmed the vehicular homicide conviction because of the presence of one or more of the aggravating factors identified in *Krovvidi*.

In Warnke's case, none of the facts that supported a vehicular homicide conviction in these other cases—for which the standard for a conviction is lower—are found here. Warnke was a mother and paraprofessional driving home after working at the school. She was not a professional driver. She was driving a compact Nissan automobile, not a loaded semitrailer truck. She was not speeding. She did not accelerate as she approached the point of impact. There were no flashing lights or warning signs to alert her to the danger

20

ahead. No one on the vehicle ahead was waving for her to go around them. She was not impaired by drugs or alcohol.

The district court found Warnke guilty of the traffic infraction of following too closely, but that was premised on the collision itself. The court also found her guilty of texting while driving, but that was premised on her reading a text from Christina while Warnke was sitting behind the wheel of her car with the engine running at the stop sign before turning onto K-43. There is no evidence that before the collision Warnke committed any traffic infraction as she proceeded down highway K-43 other than the breach of her common-law duty to keep a proper lookout of the road ahead. Speaking on a cell phone while driving is not a violation of our traffic laws. There is no evidence of conduct that constitutes a *gross deviation* from the standard of care which a reasonable person would exercise in the situation.

Besides, to convict under our reckless aggravated battery statute the defendant must consciously disregard "a substantial and unjustifiable risk that circumstances exist or that a result will follow." K.S.A. 2018 Supp. 21-5202(j). We do not conclude that a motorist traveling on a straight, flat, dry, rural highway with little traffic during daylight hours with unobstructed visibility ahead disregards a substantial risk that she will collide with some vehicle ahead if she places a cell phone call. The evidence does not support the "conscious disregard" element of the statute.

Obviously, this is not to say that Warnke was without fault. We can speculate that she probably allowed her mind to wander as she spoke to Christina on the phone. She may have been distracted while ending the call. She clearly was at fault applying the standard of ordinary negligence. She failed to maintain a proper lookout ahead. But her misconduct did not reach the high threshold for a felony criminal conviction for reckless aggravated battery. Accordingly, we reverse Warnke's two convictions for reckless aggravated battery.

21

*Misdemeanor Criminal Damage to Property*

The State charged Warnke with criminal damage to property under K.S.A. 2016 Supp. 21-5813(a)(1), (c)(3), a class B misdemeanor. The conduct this charge addresses includes "[k]nowingly damaging, destroying, . . . or substantially impairing the use" of another's property without consent. K.S.A. 2018 Supp. 21-5813(a)(1). The State did not address this charge in its closing argument. All the defense said about this charge in closing was that the State alleged "that she knowingly, intentionally damaged that trailer when she hit it with her car in a rear end accident. That's not proven." On appeal, Warnke argues:

> "Criminal negligence is a lower culpable mental state than a reckless (or knowing) culpable mental state. . . . If inattentive driving cannot support criminal negligence, it certainly cannot support a finding of reckless or knowing acts. As a result, this Court should reverse the convictions for recklessly committing aggravated battery and knowingly committing criminal damage to property and remand with directions to discharge Ms. Warnke from further liability on those charges."

We agree. Under K.S.A. 2018 Supp. 21-5202(b), the culpable mental states are listed from the highest to the lowest relative degree as follows:  (1) intentionally, (2) knowingly, and (3) recklessly. Under K.S.A. 2018 Supp. 21-5202(c), proof that a person acted knowingly, for example, also is proof that a person acted recklessly, a lower degree of culpability. But it does not work in the other direction. Proof of reckless conduct does not also constitute proof that a person acted knowingly.

Under K.S.A. 2018 Supp. 21-5202(i):

> "A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist. A

22

person acts 'knowingly,' or 'with knowledge,' with respect to a result of such person's conduct when such person is aware that such person's conduct is *reasonably certain* to cause the result." (Emphasis added.)

Here, Warnke obviously was aware that she was talking on her cell phone as she drove down the highway, thus satisfying the first part of the statute. But under the factual analysis above, the evidence does not support the requirement of the second part of the statute: that she was aware that talking on her cell phone while driving down the highway was *reasonably certain* to cause the collision she had with the boys' vehicle that day.

Accordingly, we reverse Warnke's conviction for criminal damage to property.

THE CONSTITUTIONALITY OF K.S.A. 2018 SUPP. 21-5413(b)(2)(B)

Aggravated battery under K.S.A. 2018 Supp. 21-5413(b)(2) can be committed by "recklessly causing bodily harm to another person . . . with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." (The parties brief this issue based on K.S.A. 2018 Supp. 21-5413[b][1][B] which relates to "knowingly causing" rather than "recklessly causing." Warnke was not charged under this subsection of the statute.)

Warnke argues that the phrase "can be inflicted" in the statute is unconstitutionally vague. But because we have reversed Warnke's two aggravated battery convictions, this issue is now moot and we need not address it. See *State v. Williams*, 298 Kan. 1075, 1082, 319 P.3d 528 (2014).

Warnke's two felony reckless aggravated battery convictions and her misdemeanor criminal damage to property conviction are reversed. Warnke's constitutional issue is dismissed as moot.